**AUSTIN HEART, P.A. and David J. Kessler, M.D., Appellants,**

v.

**Christian L. WEBB and Marilou Webb, Appellees.**

**No. 03–06–00607–CV.**

Court of Appeals of Texas, Austin.

May 9, 2007.

Robert L. Hargett, Emily J. Davenport, Davis & Wilkerson, P.C., Austin, for appellant.

James L. Wright, Watts Law Firm, L.L.P., Austin, for appellee.

Before Justices PATTERSON, PEMBERTON and WALDROP.

## OPINION

G. ALAN WALDROP, Justice.

Austin Heart, P.A. and David J. Kessler, M.D. appeal the district court's order denying their motion to dismiss Christian and Marilou Webb's medical malpractice claims. Austin Heart and Dr. Kessler contend that the expert report served on them pursuant to civil practice and remedies code section 74.351 did not comply with the statute because it did not sufficiently identify either Austin Heart or Dr. Kessler as the parties responsible for the alleged breach of the standard of care or the cause of the alleged injury to Mr. Webb. *See* Tex. Civ. Prac. & Rem.Code Ann. § 74.351 (West 2005 & Supp.2006). We agree that the plaintiffs' expert report was deficient and that the district court erred in denying the motion to dismiss. However, we are of the view that the cure provisions of section 74.351(c) are designed to allow the plaintiffs an opportunity to address and correct the defect. Consequently, we reverse the district court's order denying the motion to dismiss and remand this cause to the district court to consider whether a 30–day extension of the deadline for serving the report to allow the plaintiffs to address the deficiency is appropriate.

The Webbs sued Austin Heart and Dr. Kessler in January of 2006 alleging that Dr. Kessler failed to "diagnose and treat the medical condition which caused [Mr. Webb's] severe palpitations and resulting associated health conditions." The palpitations and other symptoms described by the Webbs were related to Mr. Webb's pacemaker. On May 31, 2006, the Webbs filed and served the expert report and curriculum vitae of Dr. Alan E. Cororve pursuant to the requirements of section 74.351 of the civil practice and remedies code setting forth Dr. Cororve's opinions regarding Mr. Webb's treatment for his problems with his pacemaker. Austin Heart and Dr. Kessler filed a motion to dismiss on June 21, 2006, claiming that Dr. Cororve's report did not identify either Dr. Kessler or Austin Heart as the parties responsible for breaching the standard of care or causing Mr. Webb injury and, therefore, the report was not a timely report as to them. In response, the Webbs claimed that the report was sufficient as written and, in the alternative, filed a motion for a 30–day

extension to cure in the event the court found the report deficient.

The district court initially granted the motion to dismiss on August 22, 2006, and did not grant a 30–day extension to allow the plaintiffs to attempt to cure the deficiency. The Webbs filed a motion for rehearing and a motion for new trial on September 15, 2006, arguing that the court had misinterpreted case law relating to what constitutes a sufficient report under section 74.351 and that Dr. Cororve's report was sufficient. They also re-urged their request for a 30–day extension to cure in the event the court denied their motion for rehearing. The district court then reversed its original ruling, granted the motion for rehearing, and entered an order denying the motion to dismiss. This appeal followed.

▇ Section 74.351 requires a claimant pursuing a health care liability claim to serve one or more expert reports on each party no later than the 120th day after the filing of the original petition. *Id.* § 74.351(a). The expert report must provide "a fair summary of the expert's opinions as of the date of the report regarding applicable standards of care, the manner in which the care rendered by the physician or health care provider failed to meet the standards, and the causal relationship between that failure and the injury, harm, or damages claimed." *Id.* § 74.351(r)(6). A court shall grant a motion challenging the adequacy of a report only if the report "does not represent an objective good faith effort to comply" with the definition of "expert report" in the statute. *Id.* § 74.351(*l*). To constitute a good faith effort, the report must provide enough information to fulfill two purposes: (1) it must inform the defendant of the specific conduct the plaintiff has called into question, and (2) it must provide a basis for the trial court to conclude that the claims have

merit. *Bowie Memorial Hosp. v. Wright,* 79 S.W.3d 48, 52 (Tex.2002) (*citing American Transitional Care Ctrs., Inc. v. Palacios,* 46 S.W.3d 873, 879 (Tex.2001)).

▇ The Texas Supreme Court has also stated that a report need not marshal all of the plaintiff's proof, but it must include the expert's opinion on each of the elements identified in section 74.351. *Palacios,* 46 S.W.3d at 878. A report cannot merely state the expert's conclusions about the statutory elements. *Id.* at 879. "Rather, the expert must explain the basis of his statements to link his conclusions to the facts." *Bowie Memorial,* 79 S.W.3d at 52 (*quoting Earle v. Ratliff,* 998 S.W.2d 882, 890 (Tex.1999)). In addition, since the statute focuses on what is required in the report, the only information relevant to determining whether a report complies with the statute is "within the four corners of the document." *Palacios,* 46 S.W.3d at 878. This requirement precludes a court from filling gaps in a report by drawing inferences or guessing as to what the expert likely meant or intended. *See Bowie Memorial,* 79 S.W.3d at 53 ("The report must include the required information within its four corners."); *see also Gray v. CHCA Bayshore L.P.,* 189 S.W.3d 855, 859 (Tex.App.-Houston [1st Dist.] 2006, no pet.).

▇ We review a district court's ruling on a motion to dismiss under section 74.351 for an abuse of discretion. *Palacios,* 46 S.W.3d at 877–78. A trial court abuses its discretion when it acts in an arbitrary or unreasonable manner or without reference to any guiding rules or principles. *Downer v. Aquamarine Operators, Inc.,* 701 S.W.2d 238, 241–42 (Tex.1985). A trial court does not abuse its discretion simply because it may decide a matter within its discretion differently than an appellate court. *Id.* at 242. However, a trial court has no discretion in determining

what the law is or applying the law to the facts. *Walker v. Packer*, 827 S.W.2d 833, 840 (Tex.1992). A clear failure by the trial court to analyze or apply the law correctly will constitute an abuse of discretion. *Id.*

In a single issue, Austin Heart and Dr. Kessler argue that section 74.351(b) mandates dismissal of the Webbs' lawsuit. Their argument is straightforward: Read literally, without any inferences or reliance on information outside of its four corners, Dr. Cororve's report does not identify either Dr. Kessler or Austin Heart as having breached the standard of care or having caused Mr. Webb injury. The Webbs respond that, while the sections of Dr. Cororve's report relating to the breach of the standard of care and causation do not identify any specific physicians, the meaning of the report read as a whole is apparent and reveals that Dr. Cororve is referring to Mr. Webb's treatment by Dr. Kessler.

Dr. Cororve's two and one-half page report is divided into five sections— "Qualifications," "Materials Reviewed and Background," "Standard of Care," "Standard of care not met," and "Causation." In the section titled Materials Reviewed and Background, Dr. Cororve lists the various medical records he reviewed.[1] He then sets out selected portions of these records detailing the relevant aspects of Mr. Webb's history of treatment for a trial fibrillation and palpitations over a period of nearly four years beginning with the placement of his pacemaker in November 2001. This review of Mr. Webb's treatment history includes a number of references to Dr. Kessler's office notes, comments by Dr. Kessler in those notes, complaints by Mr. Webb contained in the notes, a reference to the office notes of a Dr. George Rodgers, an email from Mr. Webb to Dr. Kessler, a response email from Dr. Rodgers,[2] and a general statement that "[Mr. Webb] was seen by various physicians, including several electrophysiological consultations." The background section concludes with the observation that "[f]urther evaluation eventually documented diaphragmatic stimulation and a new right ventricular lead was placed on September 7, 2005. The patient was subsequently discharged in excellent condition."[3] The background section of the report offers no opinions regarding the appropriateness of the treatment or the responses of the physicians to Mr. Webb's complaints. It is strictly a recitation of historical material contained in the medical records reviewed by Dr. Cororve.

The report then concludes with the following three sections:

### Standard of Care

The standard of care in a patient such as this requires more intensive investigation as to the source of a patient's symptoms and subsequent corrective actions to ameliorate the problem. Attempts at adjusting the ventricular pacing outputs should routinely be attempted and would most likely have pinpointed the problem much earlier. This standard of care was not met.

### Standard of care not met

The diagnostic and corrective action eventually taken, specifically the in-

---

1. These included records of five physicians, three hospitals, and a clinic.

2. In their brief, the Webbs state that the email response was actually by Dr. Kessler rather than Dr. Rodgers and the reference in the report is a typographical error. However, there is no evidence in the record on this point other than Dr. Cororve's report.

3. The report does not mention who was responsible for the diagnosis of diaphragmatic stimulation or placing a new right ventricular lead.

crease in the ventricular pacing output, should have been implemented much sooner.

## Causation

Had the corrective action described occurred, Mr. Webb would not have undergone the physical and mental problem(s) he had and could have continued his normal lifestyle much earlier than he did.

■ Dr. Kessler and Austin Heart point to these sections and argue that, while they may articulate an opinion on the breach of the standard of care and on causation, the sections do not identify Dr. Kessler as breaching the standard of care or causing injury.[4] The Webbs concede that these sections do not expressly mention Dr. Kessler. They argue, however, that the background section of the report makes it clear Dr. Cororve's opinions relate to Dr. Kessler because it is primarily Dr. Kessler's actions that are noted in the relevant history.[5] Thus, they argue the report should be read to mean that the opinions in the standard of care and causation sections refer to the actions and conduct of Dr. Kessler set out in the background section of the report.

The problem with this argument is that it requires the reader to infer or make an educated guess that Dr. Cororve is identifying Dr. Kessler as the physician who breached the standard of care and caused injury. Had Dr. Cororve referenced only actions by Dr. Kessler in the background section of his report, the link between Dr. Cororve's opinions and the responsible physician might be more apparent. However, Dr. Cororve also refers to actions taken by Dr. Rodgers and makes a vague reference to Mr. Webb having been "seen by various physicians, including several electrophysiological consultations" after he was treated by Dr. Kessler but before his condition improved.[6] There is nothing *in the report* that links Dr. Kessler to Dr. Cororve's opinions regarding the breach of the standard of care and causation any more than Dr. Rodgers or the other "various physicians" referenced.

The Webbs point out that (1) Dr. Kessler is the only defendant physician and (2) the essence of Dr. Cororve's opinions is that the breach of the standard of care was the failure of the treating physicians, implicitly including Dr. Kessler, to properly adjust the ventricular pacing outputs.

4. Austin Heart, P.A. is alleged to be vicariously liable for the conduct of Dr. Kessler. Dr. Cororve's report notes at the outset that "[a]ny reference in this report to David J. Kessler, M.D. refers to Dr. Kessler individually, and his employer, Austin Heart, P.A." Consequently, for the purposes of this appeal, the report must link Dr. Cororve's opinions to the actions of Dr. Kessler.

5. The Webbs suggest that a tally of the number of times a physician is mentioned in a report is significant. They note that Dr. Kessler's name appears eleven times in Dr. Cororve's report (as opposed to three times for Dr. Rodgers and once for "various physicians"). They argue that this could lead to a reasonable conclusion that the report must be about Dr. Kessler and his actions. However,

we are not persuaded that such a tally is relevant to the analysis. A physician may be named in a report any number of times simply because he was intimately involved in the treatment of a patient, yet the complaint may be with the conduct of a physician who saw the patient only once and is mentioned in the report only once. The number of times a physician is mentioned in a report, by itself, has little bearing on whether the opinions expressed in the report concern that physician. What matters, of course, is how the physician is mentioned and what the report communicates about that physician.

6. It is not clear what the reference to "various physicians" and "electrophysiological consultations" in the report means or is intended to communicate.

However, that Dr. Kessler is the only defendant physician is not relevant to an analysis of whether an expert report complies with section 74.351. The fact that he is the only defendant physician and, therefore, very likely to be the subject of the report is outside the four corners of the report. *See Palacios*, 46 S.W.3d at 878. It also does nothing to clarify to whom the opinions of the expert supplying the report apply. The expert's opinions are, of course, confined to the report and must tell the reader not only what conduct breached the standard of care, but whose conduct breached the standard of care. The plaintiffs' allegation that a particular physician was at fault does not substitute for the requirement that they supply an expert report demonstrating that the expert is of the same opinion.

We also do not agree that the substance of Dr. Cororve's opinions could only be associated with the conduct of Dr. Kessler. The essence of Dr. Cororve's opinion is that the physicians who treated Mr. Webb should have adjusted his ventricular pacing outputs sooner and the failure to do so was a breach of the standard of care. This opinion could apply or not apply equally to Dr. Kessler, Dr. Rodgers, or the various unnamed physicians. The report must state, in some manner, who breached the standard of care and who caused the alleged injury, and whether that includes Dr. Kessler. In the words of the supreme court in *Palacios*, "the report must inform the defendant of the specific conduct the plaintiff has called into question." *Palacios*, 46 S.W.3d at 879. This includes informing the defendant of the specific conduct in question *of that defendant. See Palacios*, 46 S.W.3d at 878 (The statute requires, *as to each defendant*, a fair summary of the expert's opinions about the applicable standard of care, the manner in which the care failed to meet that stan-

dard, and the causal relationship between the failure and the claimed injury).

We are mindful that a report's adequacy under section 74.351 does not depend on whether the expert uses any particular magic words such as "the standard of care was breached *by Dr. Kessler.*" *See Bowie Memorial*, 79 S.W.3d at 53. However, the report must communicate in some fashion—within its four corners—how the care rendered by the physician failed to meet the applicable standard of care and the causal relationship between that failure and the injury suffered by the claimant. Tex. Civ. Prac. & Rem.Code Ann. § 74.351(r)(6). We recognize that this information could be communicated in a number of ways and it could be communicated in sections of a report other than sections titled "Standard of Care" or "Causation." The form of the report and the location of the information in the report are not dispositive. However, in this case, Dr. Cororve's report is silent as to whether a single physician, multiple physicians, or all physicians mentioned in the report failed to meet the standard of care and caused injury to Mr. Webb. It simply does not state that the care rendered by Dr. Kessler failed to meet applicable standards and caused injury.

While we are of the view that Dr. Cororve's report is deficient under section 74.351 because it requires the reader to make an educated guess regarding an essential element, we are also aware that the defect might well be curable. The tenor of Dr. Cororve's report, coupled with the fact that there is only one physician defendant, makes it quite likely that Dr. Cororve intended to opine that Dr. Kessler breached the standard of care and caused injury even though the report did not contain that opinion. The report's failure on this point is the kind of defect that the cure provisions of section 74.351(c) were de-

signed to address. Since the district court ultimately found the report to be sufficient, the court did not consider whether a 30–day extension of the report deadline to allow the Webbs to attempt to cure a defect would be appropriate. In light of our ruling that the report does contain a defect, we believe consideration by the trial court of the Webbs' request for an extension to attempt to cure the defect is warranted.

Austin Heart and Dr. Kessler argue that *Garcia v. Marichalar*, 185 S.W.3d 70 (Tex. App.-San Antonio 2005, no pet.), supports the proposition that an expert report that references multiple health care providers but fails to delineate the standard of care, breach and causal connection as to specific, individual defendants is tantamount to no report at all with respect to those defendants. They then posit that since Dr. Cororve's report should be considered no report at all as to Dr. Kessler, the court has no discretion but to dismiss the plaintiffs' claims with prejudice. *See Jernigan v. Langley*, 195 S.W.3d 91, 94 (Tex.2006); *Marichalar*, 185 S.W.3d at 73–74. This overstates the holding in *Garcia*. The physician in *Garcia* was not mentioned in the report at all. There was literally nothing in the report that related to the physician in any way. Thus, the report was no report as to him. The *Garcia* court then held that this was a situation where no expert report was timely filed with respect to the physician in question, precluding the trial court from considering an extension to cure because there was no timely report to cure. 185 S.W.3d at 74 (trial court had no authority to allow a cure period for a nonexistent report).

A closer case is *Jernigan v. Langley*, 195 S.W.3d 91 (Tex.2006). In *Jernigan*, the supreme court noted that a mere "passing reference" to a physician in a report, without explanation of how the physician breached the standard of care or caused the injury, would not constitute a sufficient report. 195 S.W.3d at 94. The only reference to Dr. Jernigan in the report was "[a]t 4:30 p.m. [John Langley's] case was discussed with Dr. Jernigan and at 4:50 p.m. a lactulose enema was ordered." The expert's opinion on breach of the standard of care had to do with the failure to examine certain x-rays. The report did not link Dr. Jernigan or the referenced discussion with Dr. Jernigan to a breach of the standard of care or to the failure to examine x-rays in any way. It made no other mention of him or what he did at all. The supreme court noted that the single reference to Dr. Jernigan in the report was so oblique that there was no connection at all between the reference to him and the expert's opinions regarding the standard of care and causation. It affirmed the trial court's dismissal of the lawsuit based on the insufficiency of the report, stating that "the trial court had no discretion but to conclude, as it did here, that Langley's claims against Dr. Jernigan must be dismissed." *Id.*

The report in *Jernigan*, as in *Garcia*, amounted to no report at all as to Dr. Jernigan and warranted dismissal for failure to serve a timely report. There was no discretion for the court to grant an extension to cure because there was no timely report—with respect to Dr. Jernigan—to cure.[7] Any attempt by the plain-

---

7. *Jernigan* interpreted a prior version of the statute that had a different standard for granting an extension to cure. Under the previous iteration of the statute, the trial court could grant an extension only if it found that the failure to comply with the statute was "not intentional or the result of conscious indifference but was the result of an accident or mistake." *See* former Tex.Rev.Civ. Stat. Ann. art. 4590i, § 13.01(g) *repealed by* Acts 2003, 78th Leg., ch. 204, § 10.09, eff. Sept. 1, 2003. The *Jernigan* opinion does not discuss

tiffs to "cure" the reports in *Jernigan* and *Garcia* would, in effect, have been to create and serve new reports—that did not exist at all within the time period for serving reports—with respect to the physicians in question in each case. This is conceptually no different from the situation where a plaintiff simply missed the deadline for serving a report.

*Jernigan* and *Garcia* differ from this case in crucial respects. Here, a timely report plainly discusses the conduct of the physician in question and the report discusses opinions on the standard of care and causation that could be linked to the conduct of the physician set out in the report, but simply are not. The report is not deficient because it does not relate to Dr. Kessler at all. It is deficient because the link between Dr. Kessler's conduct and the expert's conclusions is not expressly stated. The report in this case is, therefore, some report as to Dr. Kessler (among others), but it is not sufficient to meet all of the requirements of section 74.531. It

is an example of what section 74.351(c) refers to as a report that "has not been served within the [120–day period for serving reports] because elements of the report are found deficient." Tex. Civ. Prac. & Rem.Code Ann. § 74.351(c). In such a circumstance, section 74.351(c) grants the trial court discretion to allow a 30–day extension of the deadline "in order to cure the deficiency." *Id. Jernigan* and *Garcia* cannot be read to mean that any deficiency in a report requires dismissal without the possibility of an extension to cure because that would mean section 74.351(c) has no possible application and is superfluous. Section 74.351(c) contemplates that there are circumstances where a timely report will be deficient, but the deficiency can be cured. To be consistent with the statute, *Jernigan* and *Garcia* must be read to allow for at least some situations where a timely report is deficient, but the trial court should consider whether the deficiency is such that it warrants allowing a cure period.[8] *Id.*

the application of this standard, the trial court's failure to grant an extension under this standard, or whether the trial court could have considered such an extension if it had made such findings. Thus, the *Jernigan* opinion is distinguishable from this case on this basis alone. However, even if the trial court's discretion to dismiss claims under either version of the statute is viewed as the same, the expert report in *Jernigan* would still constitute "no report" for the purposes of dismissal under either version of the statute.

8. The dissent argues that by remanding to allow the trial court to consider whether a section 74.351(c) extension is appropriate we are granting Dr. Kessler and Austin Heart more relief than they requested or are entitled to. The dissent's theory is that there is a distinction under section 74.351 between (1) seeking dismissal on the basis that no report was served and (2) seeking dismissal on the basis that a report was served, but it does not meet the requirements of the statute and is deficient. According to the dissent, if a defendant seeks dismissal only on the basis that no

report was served, then dismissal is not appropriate if the court finds that a report, no matter how deficient, was served. There are two problems with this theory.

First, the dismissal mechanism of section 74.351 does not work the way the dissent suggests. Under section 74.351, a claimant must serve an "expert report," as defined in the statute, or be subject to dismissal. If a claimant does not serve a report that complies with the statutory requirements, then the claimant has not served an "expert report" as defined in the statute. Whether a claimant actually fails to serve a report at all or serves a deficient report the effect under section 74.351(b) is the same—the claimant has failed to serve the required "expert report" and dismissal is the remedy. However, section 74.351(c) provides a potential cure period for situations where the claimant has served a report, but the report does not constitute the required "expert report" because "elements of the report are found deficient." The claimant then has an opportunity to fix the defect in the report that was served. If there is a

We are of the opinion that the report in this case falls into that category. It was served timely, it makes more than a passing reference to Dr. Kessler, and it notes conduct by Dr. Kessler that could be linked to the expert's conclusions regarding the breach of the standard of care and causation. It is deficient only because it does not expressly make the link between the expert's conclusions and the referenced conduct by Dr. Kessler. If the expert is of the opinion that Dr. Kessler's conduct breached the standard of care and caused injury, he will not have to generate a new, previously nonexistent report. He will simply have to add the link between his already stated conclusions and the already referenced conduct of Dr. Kessler. Therefore, the circumstances here are not similar to the situation where a plaintiff simply has missed the deadline for serving a report with respect to the conduct of a physician.

We reverse the district court's order denying the motion to dismiss filed by Austin Heart, P.A. and Dr. Kessler and remand this cause for further proceedings.

Dissenting Opinion by Justice PATTERSON.

JAN P. PATTERSON, Justice, dissenting.

While the expert report requirement in medical malpractice cases is designed to weed out frivolous claims, it is not meant to be an insurmountable hurdle. The ma-

failure to cure the defect by the extended deadline, then dismissal is mandatory because the claimant has failed to serve an "expert report" as defined in the statute.

While section 74.351(b) does not distinguish between a complete failure to serve a report and the failure to serve a complying report, there is a distinction between the two for the purposes of 74.351(c). When a claimant fails to serve a report at all, section 74.351(c) does not provide a basis for the trial court to grant any extension of the deadline for serving a report. Consequently, dismissal is mandatory without any cure period. When a claimant serves a report, but it is deficient, section 74.351(c) gives the trial court the discretion to grant an extension to cure. Regardless of whether a claimant has failed to serve a report at all or has served a deficient report, the statutory basis of the motion to dismiss by a defendant is the same—the claimant has failed to serve an "expert report" as required by section 74.351(b). The fact that the claimant who files a deficient report may request and receive an extension of time to cure the deficiencies does not alter the nature of the defendant's motion to dismiss. The motion to dismiss is on the ground that the plaintiff has failed to serve an "expert report."

Second, the defendants in this case did request dismissal on the basis that, while the Webbs had served a report that mentioned Dr. Kessler, the report "fails to address the standard of care applicable to Dr. Kessler, the breach of the standard or any alleged causal link." This is an allegation that the report served was deficient. The defendants acknowledge that a report was served and that the report addresses conduct of Dr. Kessler, but they claim it is deficient in failing to address the statutorily required elements. They are aware that section 74.351(c) grants the trial court some discretion in allowing an extension to cure certain deficient reports. But, they argue that the report in this case is so deficient that it should be viewed as "no report," requiring dismissal rather than remand for consideration of an extension period. By alleging that the deficiency is severe enough to constitute "no report" the defendants are trying to avoid the possibility of a cure period. They are not altering their claim that the report they received is deficient and will require dismissal if not corrected.

We have concluded that the report is deficient, but not so deficient as to constitute "no report." Therefore, our options are (1) reverse the trial court order denying the motion to dismiss and render judgment of dismissal or (2) reverse the trial court order and remand for consideration of whether an extension should be granted to give the plaintiffs an opportunity to attempt to cure. Remanding for the case to proceed on its merits, even though we agree with the appellants that the report is deficient, is not an option.

jority raises the bar, however, by requiring a fastidious reading of the report. The expert report proffered by the Webbs may not be a perfect report, but it is clear when viewed as a whole whose conduct is at issue—Dr. Kessler's. I therefore cannot agree that the trial court abused its discretion in finding the report adequate. I would affirm the order of the trial court.

Even assuming the report is merely "some report as to Dr. Kessler (among others)," the remand fashioned by the majority is not appropriate in this case and alters the statutory scheme crafted by the legislature. Austin Heart and Dr. Kessler moved to dismiss the Webbs' lawsuit solely on the ground that the expert report was "no report" and, thus, the trial court had no discretion to consider an extension to cure deficiencies. Having found that the report is indeed some report for which the trial court could have granted an extension, the majority has rejected Austin Heart's and Dr. Kessler's sole ground for dismissal. The appropriate remedy would be a remand to the trial court for the cause to proceed without the need for an extension. For these reasons, I respectfully dissent.

## FACTUAL AND PROCEDURAL BACKGROUND

On January 31, 2006, the Webbs filed suit against Austin Heart and Dr. Kessler, alleging that Dr. Kessler, individually, and Austin Heart, through the actions of Dr. Kessler, negligently failed to diagnose and treat Christian Webb for a medical condition related to his pacemaker that caused him to experience "severe palpitations" and other associated health conditions. On May 31, 2006, the Webbs filed the expert report and curriculum vitae of Dr. Alan Cororve pursuant to section 74.351 of the civil practice and remedies code. *See* Tex. Civ. Prac. & Rem.Code Ann.

§ 74.351(a) (West Supp.2006). Austin Heart and Dr. Kessler filed a motion to dismiss under section 74.351(b), asserting that the Webbs had failed to file an expert report specifically addressing the standard of care, breach of the standard of care, or causation as to either Austin Heart or Dr. Kessler. *See id.* § 74.351(b). The district court initially granted the motion to dismiss. The Webbs filed a motion for rehearing and motion for new trial, and the district court granted the motions. The district court then denied Austin Heart's and Dr. Kessler's motion to dismiss, and this interlocutory appeal followed.

## ANALYSIS

In their single issue on appeal, Austin Heart and Dr. Kessler argue that dismissal was mandated by section 74.351(b).

### *Abuse of discretion standard*

We review a trial court's ruling on a motion to dismiss under section 74.351(b) for an abuse of discretion. *American Transitional Care Ctrs. of Tex., Inc. v. Palacios*, 46 S.W.3d 873, 877–78 (Tex. 2001). A trial court abuses its discretion if it acts in an arbitrary or unreasonable manner or without reference to any guiding rules and principles. *Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241–42 (Tex.1985). When reviewing matters committed to the trial court's discretion, we may not substitute our own judgment for that of the trial court. *Walker v. Gutierrez*, 111 S.W.3d 56, 63 (Tex.2003).

### *The expert report requirement*

In a health-care liability claim, the claimant must provide each defendant with one or more expert reports, including a curriculum vitae for each expert, within 120 days of filing the original petition. Tex. Civ. Prac. & Rem.Code Ann. § 74.351(a). An "expert report" is:

a written report by an expert that provides a fair summary of the expert's

opinions as of the date of the report regarding applicable standards of care, the manner in which the care rendered by the physician or health care provider failed to meet the standards, and the causal relationship between the failure and the injury, harm, or damages claimed.

*Id.* § 74.351(r)(6). Failure to serve an adequate expert report mandates dismissal with prejudice. *Id.* § 74.351(b). A report need not marshal all of the plaintiff's proof, but it must include the expert's opinion on each of the elements identified in the statute. *Palacios,* 46 S.W.3d at 878. To constitute a good faith effort, the report must inform the defendant of the specific conduct called into question and provide a basis for the trial court to determine that the claims have merit. *Id.* at 879.

The supreme court has stated that "to avoid dismissal, a plaintiff need not present evidence in the report as if it were actually litigating the merits. The report can be informal in that the information in the report does not have to meet the same requirements as the evidence offered in a summary-judgment proceeding or at trial." *Id.* Because the statute focuses on what the report should discuss, the only information relevant to the inquiry is that which appears within the four corners of the document. *Id.* at 878. When examined in its entirety, an expert report may be so deficient as to a particular defendant that it constitutes no report as to that defendant. *See, e.g., Garcia v. Marichalar,* 198 S.W.3d 250, 255 (Tex.App.-San Antonio 2006, no pet.) (*Garcia II*); *Garcia v. Marichalar,* 185 S.W.3d 70, 74 (Tex.

App.-San Antonio 2005, no pet.) (*Garcia I*).

### Dr. Cororve's report

To satisfy the expert report requirement, the Webbs served Austin Heart and Dr. Kessler with a two-and-one-half-page report from Dr. Cororve. The report begins by stating that "[a]ny reference in this report to Dr. David J. Kessler, M.D. refers to Dr. Kessler individually, and his employer, Austin Heart, P.A." [1] In a section titled "Materials Reviewed and Background," the first paragraph begins, "My opinions are based upon my review of . . . ," then lists specific medical records and office notes from four medical facilities and five doctors, and states that "[i]n addition, my opinions are based upon my experience, training, knowledge, and qualifications as a physician." The report next discusses Mr. Webb's treatment history following the implantation of his pacemaker on November 30, 2001:

> Subsequent to that procedure, Mr. Webb complained on various occasions concerning his sensing the pacemaker pacing or being aware of forceful heartbeats. To that extent, Dr. Kessler noted on 01/18/02 "possibly diaphragmatic stimulation intermittently." With the office visit of 03/19/03, Dr. Kessler notes this was the second complaint of abdominal twitching. The pacemaker was reduced to see if abdominal symptoms could be relieved with less frequent pacing. On 04/25/03, Dr. Kessler states the patient was aware of pacing intermittently and was suspicious of diaphragmatic stimulation.

---

1. While Dr. Cororve's report explicitly mentions Austin Heart, the Dallas court of appeals has held that when a defendant is only alleged to be vicariously liable for the negligence of another defendant, the expert report need not specifically name or address the negligence of the defendant to whom liability will be imputed. *University of Tex. Southwestern Med. Ctr. v. Dale,* 188 S.W.3d 877, 879 (Tex.App.-Dallas 2006, no pet.). What is relevant is that the report specifically identify the person whose conduct the plaintiff is calling into question and show how that person's conduct constituted negligence. *Id.*

Dr. Kessler states he had previously assessed this and had not found it to be present. On that day, he tested the pacemaker with various outputs, the patient was aware of pacing at higher outputs, but the doctor did not believe the patient had true diaphragmatic stimulation.

During a pacemaker check performed on 06/08/03, the patient stated he still had "hiccup" feelings in his abdomen, and Dr. Rodgers' office note of 05/06/04 stated the patient had some feelings of hiccup-like discomfort.

On 12/16/04, Dr. Kessler references the patient's ongoing anxiety, use of Xanax and his request for the PCP's assistance managing the anxiety. Mr. Webb's email to Dr. Kessler on 04/27/05 states how the patient's "been suffering two years." The patient's email of 05/04/05 asks if the pacemaker lead might be in the wrong place, and Dr. Rodgers responded "no."[2] Dr. Kessler's note of 05/27/05 states the patient was complaining of palpitations but "I am reluctant to place a new lead at this time."

Subsequent to these events, Mr. Webb continued to have palpitations and problems with diaphragmatic stimulations. He was seen by various physicians, including several electrophysiological consultations. The persistence of his symptoms significantly impaired his quality of life and ability to concentrate at work. Because of this, he was presecribed an anti-depressant and anti-anxiety medication. Further evaluation eventually documented diaphragmatic stimulation and a new right ventricular lead was placed on September 7, 2005. The patient was subsequently discharged in excellent condition.

The report has three final sections setting out the three statutorily required elements:

### Standard of Care

The standard of care in a patient such as this requires more intensive investigation as to the source of a patient's symptoms and subsequent corrective actions to ameliorate the problem. Attempts at adjusting the ventricular pacing outputs should routinely be attempted and would most likely have pinpointed the problem much earlier. This standard of care was not met.

### Standard of care not met

The diagnostic and corrective action eventually taken, specifically the increase in the ventricular pacing output, should have been implemented much sooner.

### Causation

Had the corrective action described occurred, Mr. Webb would not have undergone the physical and mental problem(s) he had and could have continued his normal lifestyle much earlier than he did.

Austin Heart and Dr. Kessler do not challenge the adequacy of the report's description of these three elements; rather, they assert that it is not clear to which doctor they apply because the report mentions five doctors and four health care institutions, but fails to reference any of the providers in the analysis of standard of care, breach and causation. They urge,

---

2. Earlier in the report, under the materials reviewed section, Dr. Cororve refers to an e-mail from Mr. Webb to Dr. Kessler dated 05/04/05. In their brief on appeal, the Webbs assert that the report erroneously attributes the response to that e-mail as being from Dr. Rodgers when it was actually from Dr. Kessler. There is, however, no evidence in the record indicating who sent the e-mail.

therefore, that Dr. Cororve's report is essentially "no report" as to Austin Heart and Dr. Kessler.

Because Austin Heart and Dr. Kessler do not contest the adequacy of the report's descriptions of the statutorily required elements, the only question before this Court is whether the trial court abused its discretion in determining that the report sufficiently ties Dr. Kessler to the analysis of the statutory elements. From the context and structure of the report, it is clear that Dr. Cororve's listing of the notes and records of the doctors and health care institutions in the "Materials Reviewed" paragraph of the report was not intended to make the doctors or health care institutions themselves the focus of Dr. Cororve's analysis. Thus, the focus is on the section of the report discussing Mr. Webb's medical treatment and the sections setting out the statutorily required elements. In the medical-treatment discussion, only two doctors are named—Dr. Kessler and Dr. Rodgers—and there is one reference to unnamed "various physicians." No doctor is expressly mentioned in the sections addressing the statutorily required elements.

Austin Heart and Dr. Kessler contend that Dr. Cororve's report did not adequately tie Dr. Kessler to the statutory elements, citing this Court to *Jernigan,* 195 S.W.3d 91, *Garcia II,* 198 S.W.3d 250, *Garcia I,* 185 S.W.3d 70, and *Longino v. Crosswhite ex rel. Crosswhite,* 183 S.W.3d 913 (Tex.App.-Texarkana 2006, no pet.). These cases are distinguishable.

In *Jernigan,* the plaintiff filed suit against a hospital and several physicians including Dr. Jernigan. 195 S.W.3d at 92. The plaintiff served two expert reports; however, the first failed to mention Dr. Jernigan at all, and the second mentioned him in only one sentence: "At 4:30 p.m. [the plaintiff's] case was discussed with Dr. Jernigan...." *Id.* at 93. The supreme court concluded that the report was inadequate as to Dr. Jernigan, stating that "[t]his passing reference does not identify with specificity any action or inaction by Dr. Jernigan that breached the applicable standard of care. This perfunctory mention alleges no misconduct whatsoever, much less discusses the required elements with 'sufficient specificity' to inform Dr. Jernigan of 'the conduct the plaintiff has called into question.'" *Id.* (quoting *Palacios,* 46 S.W.3d at 875).

In *Longino,* the plaintiffs sued two doctors and a hospital for failing to diagnose their child's bacterial meningitis sooner. 183 S.W.3d at 915. The plaintiffs served a single expert report that did not distinguish between the actions of the two doctors. *Id.* at 917. The report stated that, "[i]n consultation with Dr. James Longino," Dr. Cameron ordered tests and admitted the plaintiffs' child to the hospital, and in the discussion of the standard of care, the report stated that

> Dr. Cameron['s] and Dr. Longino's care of [the plaintiffs' child] fell below the standard of care.... Their failure to either recognize or acknowledge the obvious symptoms of fever, altered mental status, and neck pain; to perform a timely diagnostic lumbar puncture; and to aggressively treat [the child's] bacterial meningitis with an appropriate combination of antibiotics led to an unnecessary exacerbation of his symptoms.

*Id.* The court concluded that the report contained "no specific information concerning how Longino breached the standard of care apart from Cameron's conduct," and therefore did not demonstrate a good-faith effort as to Longino. *Id.*

In the *Garcia* cases, the plaintiff filed suit against three doctors, two nurses, and a hospital. *Garcia II,* 198 S.W.3d at 252. The plaintiff served two expert reports, but neither report mentioned Dr. Garcia at

all. *Id.* Dr. Garcia filed a motion to dismiss the claims against him asserting that he had not been "served" with a report. *Id.* The trial court initially granted the motion, but later dissolved its order and granted the plaintiff a 30–day extension to cure any deficiencies in the report. *Id.* In *Garcia I,* the appellate court addressed the extension, distinguishing situations in which a deficient report is filed from those in which no report is filed—a trial court has discretion to grant a 30–day extension in the former situation, but not the latter. 185 S.W.3d at 73. Because the reports served by the plaintiff focused on the acts of other defendants and failed to mention Dr. Garcia at all, the court concluded that Dr. Garcia had not been served with a report and, thus, the trial court did not have authority to grant the extension. *Id.* at 74. In *Garcia II,* the appellate court addressed Dr. Garcia's motion to dismiss. 198 S.W.3d 250. The court concluded that "neither report informed Dr. Garcia of the specific conduct he allegedly performed that [the plaintiff] had called into question," and, thus, the expert reports did not constitute a good-faith effort to comply with the statutory requirements. *Id.* at 255. The court therefore held that the trial court abused its discretion in denying Dr. Garcia's motion to dismiss, and the cause was remanded with instructions to the trial court to render judgment dismissing the claims against Dr. Garcia with prejudice and to award him his reasonable attorney's fees and costs of court. *Id.* at 256 (citing Tex. Civ. Prac. & Rem.Code Ann. § 74.351(b)).

Unlike *Jernigan, Longino,* and *Garcia,* in this case, the Webbs have filed a lawsuit complaining of the actions of only one doctor, Dr. Kessler, and their expert report is not one in which they mentioned him only in passing, in connection only with another doctor, or not at all. Instead, he is the subject of the majority of the report and is named eleven times.[3] The first paragraph, which states that any reference to Dr. Kessler refers to him individually and to his employer, Austin Heart, may be fairly read as signaling that the report is about Dr. Kessler. In addition, Dr. Cororve's description of Mr. Webb's medical history covers five visits with and one e-mail to Dr. Kessler spanning two and one half years in which Dr. Kessler noted the following: "possibly diaphragmatic stimulation intermittently," a second complaint about abdominal twitching, Mr. Webb's awareness of pacing intermittently and suspicion of diaphragmatic stimulation, Mr. Webb's awareness of pacing at higher outputs, disbelief that the patient had true diaphragmatic stimulation, Mr. Webb's ongoing anxiety and request for assistance managing the anxiety, and Mr. Webb's complaining of palpitations, but "I am reluctant to place a new lead at this time." The report's two references to comments from Dr. Rodgers—a notation that the patient had some feelings of hiccup-like discomfort and a response of "no" to Mr. Webb's e-mail asking if the lead might be in the wrong place—as well as the single reference to unnamed "various physicians," do not obscure the report's focus on the actions of Dr. Kessler. In addition, unlike *Longino,* the actions of the two doctors named are distinguishable.

Dr. Cororve's analysis of the statutory elements states that the standard of care required "more intensive investigation," "[a]ttempts at adjusting the ventricular pacing outputs should routinely be attempted," and "[t]he diagnostic and correc-

---

**3.** While *it is true that the number of times a* physician is named, by itself, does not indicate the report complains of that physician's conduct, *it is more likely that a report discussing mainly the conduct of one physician is about the conduct of that physician.*

tive action eventually taken, specifically the increase in the ventricular pacing output, should have been implemented much sooner." In the discussion of Mr. Webb's medical history earlier in the report, it appears that both Dr. Kessler and Dr. Rodgers investigated Mr. Webb's symptoms; however, only Dr. Kessler is named in connection with testing and making adjustments to the pacemaker. In addition, Dr. Kessler's notations contradict what Dr. Cororve states is the standard of care. According to Dr. Cororve's report, Dr. Kessler "did not believe the patient had true diaphragmatic stimulation" however, "[f]urther evaluation eventually documented diaphragmatic stimulation and a new right ventricular lead was placed." Under "Standard of Care," Dr. Cororve states that "[a]ttempts at adjusting the ventricular pacing outputs should routinely be attempted and would most likely have pinpointed the problem much earlier." After reviewing the report in its entirety, I cannot conclude that the trial court abused its discretion in determining that the report represents a good-faith effort to address the actions of Dr. Kessler.

### The Remand

The majority concludes that Dr. Cororve's report is deficient and remands this cause to the district court to consider whether a 30–day extension is appropriate to address the deficiency. This remedy is inappropriate because it provides relief to Austin Heart and Dr. Kessler on a ground not raised in the trial court or on appeal. *See* Tex.R.App. P. 33.1.

Austin Heart and Dr. Kessler challenged Dr. Cororve's report solely on the ground that it was "no report," not that it was a "deficient report."[4] The difference between the two is strategically significant. If the report is "no report," then the trial court *must* dismiss the case with prejudice and has no discretion to grant a 30–day extension. Tex. Civ. Prac. & Rem.Code Ann. § 74.351(b)-(c); *Garcia I*, 185 S.W.3d at 73. Yet, if the report is merely "deficient" (and timely filed, as here), the trial court is not required to immediately dismiss and has discretion to grant a 30–day extension to cure the deficiencies. Tex. Civ. Prac. & Rem.Code Ann. § 74.351(c).

Austin Heart and Dr. Kessler elected to move for dismissal solely on the ground that the report was "no report."[5] Having concluded that the report is "some report as to Dr. Kessler (among others)," the majority has rejected the sole ground for dismissal. As such, the appropriate remedy would be a remand to the trial court for the cause to proceed without the need for an extension.

### CONCLUSION

In summary, I disagree with the majority's holding that the trial court abused its

---

4. The motion to dismiss clearly distinguishes the two scenarios, stating:

   > This is not an occasion in which a report was served on Austin Heart, P.A. or David J. Kessler, M.D. wherein the expert failed to address a requisite element, such as the standard of care, the alleged breach of the standard, or the alleged causal link, thus making the report deficient. Here, the report constitutes no report at all.

   Thus, Austin Heart and Dr. Kessler did not, as the majority contends, "argue that the report in this case is so deficient that it should be viewed as 'no report.'"

5. The remand fashioned by the majority grants Austin Heart and Dr. Kessler relief not requested because the majority treats their motion to dismiss as if it were based on two grounds: (1) that the report was "no report" and (2) that even if the report was some report that it was deficient. Austin Heart's and Dr. Kessler's motion, however, was based solely on the first ground. Without a motion to dismiss based on *deficiency*, there is no basis for a finding of deficiency and no need for a 30–day extension "to cure the deficiency." *See* Tex. Civ. Prac. & Rem.Code Ann. § 74.351(c).

discretion in finding that the expert report proffered by the Webbs adequately links Dr. Kessler to the elements of standard of care, breach of the standard, and causation. I would affirm the order of the trial court. I further disagree with the remedy fashioned by the majority because it grants relief to Austin Heart and Dr. Kessler on a ground that they did not raise in the trial court or on appeal. For these reasons, I respectfully dissent.